**AMERICAN FLORAL SERVICES, INC., Plaintiff,**

v.

**FLORISTS' TRANSWORLD DELIVERY ASSOCIATION and Teleflora, Inc., Defendants.**

**No. 84 C 1824.**

United States District Court, N.D. Illinois, E.D.

Feb. 13, 1986.

On Motion to Vacate April 15, 1986.

Francis J. McConnell, Elizabeth J. Caprini, Peter S. Lubin, McConnell & Associates, Chicago, Ill., for plaintiff.

Jack Lipson, Kenneth A. Letzler, Bruce M. Cormier, Arnold & Porter, Washington, D.C., James W. Collins, Brian Martin, Boodell, Sears, Giambalvo & Crowley, Chicago, Ill., for FTD.

Daniel Fogel, Loren R. Rothschild, Joel N. Klevens, Michael D. O'Shea, Fogel, Rothschild, Feldman & Ostrov, Los Angeles, Cal., William G. Schopf, Charles S. Bergen, Reuben & Proctor, Chicago, Ill., for Teleflora.

## MEMORANDUM OPINION AND ORDER *

SHADUR, District Judge.

American Floral Services, Inc. ("AFS") sues Florists' Transworld Delivery Association ("FTD") and Teleflora, Inc. ("Teleflora") under Clayton Act §§ 4 and 16, 15 U.S.C. §§ 15 and 26, seeking damages and injunctive relief based on claimed violations of Sherman Act § 1 et seq., 15 U.S.C. § 1 et seq. ("Section 1"). Complaint Count I charges FTD conspired with its members:

1. to discourage and prevent the use of services marketed by AFS, through adoption and enforcement of FTD Membership Rule 18(b) ("Rule 18(b)"); and

2. to fix and maintain the price of floral clearinghouse services at 6% of the gross order amount.

Count II charges Teleflora conspired with its subscribers:

1. to discourage and prevent the use of services marketed by AFS, through adoption and enforcement of Teleflora Membership Obligation 2 ("Obligation 2"); and

2. to fix the price of floral clearinghouse services at 6% of the gross order amount.

Finally, Count III charges FTD and Teleflora conspired with each other to discourage and prevent the use of AFS' services and to fix the price of floral clearinghouse services.

Each of FTC and Teleflora has moved for summary judgment under Fed.R.Civ.P. ("Rule") 56 as to each count in which it is named. For the reasons stated in this memorandum opinion and order, both motions are granted in full.[1]

---

\* This opinion differs from the original (filed under seal) in one respect: At Teleflora's request (in response to this Court's inquiry at n. 32), the statement of facts has been modified by redacting certain data Teleflora reasonably views as previously-undisclosed confidential business information. None of the changes affects application of the operative legal principles.

1. It is appropriate at the opening gun to express special thanks to this Court's law clerk C. Steven Tomashefsky, Esq. for his efforts on this opinion. Of course judges, not law clerks, write opinions. One of the rules this Court has lived by since being appointed is that no case will ever be cited in any opinion unless this Court has first read that case to confirm it stands for what the opinion says. And every sentence in every opinion is (for better or worse) the product of this Court's drafting or redrafting—or in the rare situation in which there has been no change in a sentence from a law clerk's draft, that absence of change reflects this Court's deliberate judgment that the draft says precisely what this Court intends in precisely the way this Court intends. Having said all that, though, it is worth adding that in this case the Herculean job of distilling a manageable first draft of an opinion from nearly 400 pages of briefs (supplemented by some 60 pages of statements of facts under this District Court's General Rule 12(e) and 12(f) )—and all this after wading through an 18-inch-thick pile of evidentiary submissions—was Mr. Tomashefsky's. Moreover, AFS' briefing gave a highly misleading portrayal of the evidence (or claimed evidence) and an inaccurate characterization of the applicable law, while both FTD's and Teleflora's briefing somewhat oversanitized both the facts and the law to favor their positions. Even though all the presentations thus reflected the to-be-expected operation of the adversary process (each side overstating its position, with the truth somewhere in between), they certainly made the production of a coherent treatment of the issues that much harder. But Mr. Tomashefsky did indeed furnish a coherent treatment to this Court as grist for its mill, and to the extent this opinion does not meet that benchmark the fault is this Court's, not Mr. Tomashefsky's.

*Facts* [2]

AFS, FTD and Teleflora are the largest among a group of floral clearinghouses ("Clearinghouses"), which facilitate long-distance delivery of fresh flowers. Clearinghouse transactions are typically handled this way:

1. Someone who wants to send flowers ("Customer") places an order with a nearby florist ("Sending Florist"). That order may be either generic (say "a dozen roses"), or "open" (say "$25 worth of flowers") or "special" (a design—usually trademarked—illustrated in a Clearinghouse's proprietary selection guide).

2. Using a membership directory provided by one of the Clearinghouses to which Sending Florist belongs, Sending Florist selects another florist ("Filling Florist") capable of delivering the order in the recipient's location. Sending Florist may telephone Filling Florist to verify the latter's filling and delivering capability, as well as price.[3]

3. Sending Florist transmits the order to Filling Florist, either by phone or via one of the on-line computer communication systems some Clearinghouses provide. At the time of transmittal Sending Florist identifies the Clearinghouse through which the order is to be cleared.

4. Filling Florist receives, fills and delivers the order.

5. Meanwhile Customer has paid Sending Florist for the order. Sending Florist keeps 20% of the payment as a commission and sends the rest to the Clearinghouse chosen to clear the order. That Clearinghouse remits the balance to Filling Florist, less a Clearinghouse fee for its services. AFS, FTD and Teleflora all charge a 6% fee. Those financial transactions are handled on an account basis with each Clearinghouse, and each individual florist's net credit or debit is reflected in monthly statements much like bank statements (Meinders Dep. 107–08).

6. Some Clearinghouses (including AFS but not FTD or Teleflora) also credit Sending Florist with a so-called "rebate," amounting to a fixed cash payment of 60 cents or more for each order sent through that Clearinghouse.

That brief overview of the floral delivery system shows Clearinghouses perform numerous functions (though not all Clearinghouses provide all of them). In the main the Clearinghouse role comprises:

1. the clearinghouse-banking function itself, insuring a reliable flow of money between florists who may otherwise be strangers;

2. communications, including both provision of private on-line systems and publication of directories identifying distant florists with whom to communicate;

3. advertising, including both in-store promotion of "special" arrangements illustrated in selection guides and general promotion of the idea of sending flowers long-distance;

4. quality control, through both published standards and test orders; and

5. education, through publications and seminars for florists and floral designers.

There are presently some 30 to 32 thousand florist shops in the United States (Meinders Dep. 2014). Average gross sales per florist in 1984 were $185,000 (Mitchell Dep. III 61). That adds up to $5 to 6 billion of annual florist business. Of that, something over $750 million (or 12 to 15%)

---

**2.** Rule 56 imposes on the party moving for summary judgment the burden of establishing the lack of a genuine issue of material fact. *Korf v. Ball State University*, 726 F.2d 1222, 1226 (7th Cir.1984). For that purpose the court must, in viewing the evidence, draw all reasonable inferences in the light most favorable to the nonmovant—here AFS. *Hermes v. Hein*, 742 F.2d 350, 353 (7th Cir.1984). Throughout this opinion the recitals of facts adhere to those principles.

**3.** It is not wholly clear from the parties' submissions whether Filling or Sending Florists set the price of generic and special orders. Evidently prices listed in Clearinghouse-published selection guides are only "suggested" for Customer reference (see *United States v. FTD ["FTD I"]*, 1969 Trade Cas. (CCH) ¶ 72,717, at 86,564 (E.D. Mich.1969) (consent decree, reprinted in FTD's *Members' Guide* at 120 (Maas Aff.Ex. 1) ).

makes up the long-distance delivery market (Meinders Dep. 73; Resnick Aff. ¶ 14).[4] That market is divided among some 11 Clearinghouses (Maas Aff.Ex. 3), up from 5 in 1970 (Meinders Dep. 65–67). AFS, FTD and Teleflora are now the big three: Current rough market share estimates are FTD 65%, with Teleflora and AFS ranking next, and with all others representing an aggregate of perhaps 10% (See AFS App. 8B).

FTD is by far the oldest Clearinghouse, founded as a nonprofit cooperative membership organization over 75 years ago (Maas Aff. ¶ 5). It is owned by its 20,800 member florists (*id.* ¶ 3).[5] Teleflora was founded in 1961 and has been under the present ownership of Lynda Resnick ("Resnick") and her husband Stewart since 1979 (Meinders Dep. 929; Resnick Aff. ¶ 1). It has 17,322 members (Teleflora Resp. to AFS Int. 7). AFS was formed in 1970 by Herman Meinders ("Meinders"), formerly a sales manager at Florafax, another Clearinghouse (Meinders Dep. 65–66). From an initial 139 subscribing florists (*id.* at 943), AFS has grown to serve a membership of 17,000 (*id.* at 75).

When AFS entered the industry in 1970, its selling point was free sending (until that time both Sending and Filling Florist had paid a share of the Clearinghouse fee) (Meinders Dep. 67).[6] Though Sending Florist selects the Clearinghouse, AFS decided to charge the entire fee to the Filling Florist. That innovation proved popular, and by 1975 all Clearinghouses had gone to free sending (*id.* at 68).

AFS then introduced a 2% "discount" to Sending Florists—a payment to them of 2% on each order they sent via AFS. That formula proved difficult to administer, and in 1980 AFS introduced its cash "rebate" program: fixed cash payments for each order sent via AFS (*id.* at 71). At present the rebate is 60 cents on each of the first 25 orders per month and $1.00 on each additional order, assuming the florist's monthly statement is current (*id.* at 128). It can be seen the "rebate" is not really that but rather a sort of sales incentive payment, for under what has now become well-established industry custom, Sending Florists pay nothing to Clearinghouses. AFS' "rebate" obviously offers Sending Florists a strong reason to select AFS.

FTD and Teleflora have pursued a different promotional approach. While AFS does little or no consumer advertising (Meinders Dep. 133), both FTD and Teleflora advertise extensively—though each has a somewhat different focus.

FTD advertises its servicemarks (the "Mercury" symbol and the slogan "Flowers by Wire") as well as its trademarked special arrangements: No one in the industry advertises more (Meinders Dep. 1600). Total FTD advertising expenditure in fiscal 1984 was over $17 million (Maas Aff. ¶ 8).

As for Teleflora, beginning in 1980 it developed and began advertising its "keepsake" concept: proprietary floral contain-

---

4. That figure represents all orders cleared through a Clearinghouse. It omits "quite a bit" of direct billing among florists who prefer not to use any Clearinghouse at all (Meinders Dep. 73).

5. As this and the other numbers in this text paragraph reflect, the total number of florists belonging to AFS, FTD and Teleflora substantially exceeds the total number of United States florists, because many florists belong to more than one Clearinghouse. For example, 85% of FTD members belong to another Clearinghouse (Putro Aff. ¶ 8)—indeed, 51% belong to AFS (Maas Aff. ¶ 21). About 60% of AFS members also belong to FTD (AFS Resp. to FTD Int. 4(c)). At one time FTD's rules prohibited its members from belonging to any other Clearing-

house, but that rule was rescinded by a consent decree after challenge in federal court (see *United States v. Florist's Telegraph Delivery Ass'n*, 1956 Trade Cas. (CCH) ¶ 68,367 (E.D.Mich.1956) (reprinted in FTD's *Members' Guide* 117 (Maas Aff.Ex. 1) ); see also *FTD I*, repeating that provision (see n. 3) ). Later discussion will focus on the significance of multiple membership.

6. According to Meinders Dep. 67 the fee structure in 1970 was as follows:

  FTD: 2½% from Sending Florist
    3½% from Filling Florist
  Teleflora: 1% plus 25 cents from Sending Florist
    1% plus 25 cents from Filling Florist
  Florafax: 5% from Sending Florist
    5% from Filling Florist

ers keyed to specific holidays and having lasting value after the flowers die (Resnick Aff. ¶ 4). Teleflora designs the keepsakes and sells them exclusively through its subscribers (*id.*). Though FTD also designs and markets containers, Teleflora's emphasis on that component of its services is far heavier: Its advertising is principally focused on its keepsake promotions (*id.* ¶¶ 5–6). Teleflora had a multi-million dollar 1984 advertising budget (*id.* ¶ 7). However, keepsake orders represented only a fraction of Teleflora's 1984 clearings (*id.* ¶ 14), and obviously a much smaller fraction of the total Clearinghouse market (*id.*).[7]

In 1968 FTD initiated a money-back guaranty policy: Customers sending orders through the FTD Clearinghouse were entitled to a refund if the flowers delivered were not of the quality and quantity ordered (Putro Aff. ¶ 10). FTD currently receives over 10,000 customer complaints annually (*id.* ¶ 11). However, some unknown proportion of those complaints comes from Customers whose orders were cleared through another Clearinghouse—orders to which FTD's guaranty understandably does not extend (*id.* ¶ 12).

FTD adopted the first version of Rule 18(b) in 1973. It read (*id.* ¶ 14):

Florists' Transworld Delivery Association orders received from another member shall be filled in accordance with the rules and regulations of FTD. A member taking an FTD order who is instructed by a customer to send the order as an FTD order, shall send the order to an FTD member and the order shall be processed through the FTD Clearing House.

Along with Rule 18(b) itself, FTD published an interpretation in its rulebook (Putro Aff.Ex. 11, at 2):

The foundation of public confidence in the flowers-by-wire idea is the integrity of the sending and the filling florist. When a florist who holds himself out to the public as a Member of FTD violates this integrity, each of the Members of FTD is damaged by the resulting public

disaffection and distrust. FTD has, through the years, received complaints from customers who believe that they have not been fairly treated by FTD Members. The honesty in business dealings of Members has been questioned by customers. Customers have complained about the failure to receive full value for local orders, FTD orders and orders placed by FTD Members through other wire services or clearing houses. The inexcusable practice of curtailment [when Sending Florist sends an order for less than the amount actually received from Customer, or when Filling Florist supplies flowers worth less than the amount transmitted (Mass Aff. ¶ 14)] has occurred in FTD transactions and has frequently resulted in discipline to Members involved, including termination of Membership in FTD. In cases where a Member who is also a member, subscriber or user of another wire service or clearing house engages in curtailment, customers have directed criticism at FTD and FTD Members because the florist is a Member of FTD. This rule reaffirms the duty of a Member to maintain honesty in business dealings in all transactions and will subject a Member to discipline if he fails to do so.

Rule 18(b)'s scope was broadened in 1975, when it was amended to provide that a Customer who orders a "Holiday Special" arrangement by a name which has been trademarked by FTD" would be *presumed* to have requested FTD's Clearinghouse services "unless the customer expressly instructs otherwise" (Putro Aff.Ex. 12, at 2). In 1976 Rule 18(b) was amended to provide for suspension or other discipline if an FTD member refused to accept and send an order via FTD where Customer had so instructed (Putro Aff.Ex. 13, at 2). Finally in 1982 the presumption applying to "Holiday Special" arrangements was expanded to include any order where Customer refers to an FTD trademark or to an arrangement pictured in FTD's published guides (Putro Aff.Ex. 14, at 2).

---

**7.** Specific percentages based on Resnick's own figures are included in the original (sealed) ver- sion of this opinion (see n. *).

On its face Rule 18(b) does not require an FTD florist to send any FTD-identified products through the FTD Clearinghouse: Though the Rule creates certain presumptions about customer requests, it is subject to customer override. In mid-1982 FTD reworded its "interpretation" of Rule 18(b) to point out the rule does not prohibit an FTD florist from suggesting an alternative Clearinghouse to Customer and using that alternative if Customer expressly approves.[8]

Teleflora has had a related concern stemming from its keepsake program: To the extent orders for its keepsakes were not being cleared through its Clearinghouse, it felt it was not getting the Clearinghouse fees on orders its own merchandising efforts had generated. According to Resnick Dep. 50:

> [W]e felt we had to protect what we had spent so much money building through our national advertising and overhead, et cetera, and through a series of events it became clear that various florists were not respecting the fact that Teleflora generated orders should be sent through Teleflora clearinghouse.

To deal with that perceived problem, in June 1982 Teleflora promulgated Obligation 2, as Resnick Aff. ¶ 12 says:

> to prevent other clearinghouses from free riding on Teleflora's advertising and marketing expenditures and from obtaining the clearinghouse commission on wire orders for Teleflora keepsakes ....

Obligation 2 provides (Resnick Dep. Ex. 4, at 7):

2. Any florist sending or receiving a wire order that specifies an exclusive TELEFLORA holiday promotion keepsake product or bouquet from the counter selection guide, must credit the transaction to TELEFLORA's clearinghouse. Knowingly crediting any other wire services for sales generated by TELEFLORA programs or national advertising is grounds for disciplinary action including potential dismissal from TELEFLORA.

In contrast to Rule 18(b), Obligation 2 offers no choice to Selling Florist or Consumer. Further, Teleflora's express motivation in promulgating Obligation 2 was not to promote consumer-protection measures or to implement a quality guaranty. It was rather to prevent other Clearinghouses from "free riding" on Teleflora's marketing and advertising expenditures.

During the early 1980s AFS' rebates and aggressive sales program[9] stimulated a sharp increase in its market share.[10] No doubt in response to that competition, FTD and Teleflora became more aggressive in enforcing Rule 18(b) and Obligation 2, respectively.

FTD Executive Vice President William A. Maas ("Maas") observed in a December 1981 article circulated to FTD members (AFS App. 2 Doc. 19):[11]

> One of the concerns which I expressed at the [district officers'] meeting is the apparent disregard of FTD Rule 18(b), which prohibits the sending of FTD orders through other wire services after having been instructed by the customer to send the order through F.T.D.

**8.** Rule 18(b)'s full current text and interpretation (Putro Aff.Ex. 14, at 2–3) are reproduced as Appendix 1 to this opinion.

**9.** In 1980 or 1981 AFS conducted a two-week sales "blitz" during which it signed up 3,300 new members by offering a money-back guaranty, a reduced rate and a "special rebate" (Meinders Dep. 1020–22).

**10.** AFS' own unauthenticated summary of market-share data lists AFS' share as increasing from 3.82% in 1980 to a high of 10.9% in 1983, with a slight falling-off to 10.71% in 1984. At the same time AFS' figures show FTD's share fell from 74.02% in 1980 to 68.49% in 1984, while Teleflora's share during that period re-

mained essentially static (AFS App. 8B Ex. 1). AFS provides no foundation for its tabulations, and those figures must therefore be considered illustrative only.

**11.** AFS has submitted four weighty appendices of "documents" culled from its discovery efforts. As FTD App. 13 Tab. B points out, many (in fact, the majority) of those documents are unauthenticated and do not meet Rule 56(e)'s admissibility requirements (Tab B lists the unauthenticated documents). All AFS-appendix documents relied on in this opinion are either (1) authenticated or (2) unopposed by FTD or Teleflora.

We have begun a program to educate our Members on the serious repercussions involved in the violation of this rule. We will now be taking stern measures in its enforcement through test orders and by asking Members to inform Headquarters of any violations.

Further, an FTD executive now employed by AFS recalls (Butler Aff. ¶ 7):

Mr. Maas informed the staff at a meeting in the early fall of 1981 that he wanted to stop the inroads by AFS into FTD's clearings and that FTD could use Rule 18(b) to accomplish this goal. Mr. Maas stated that he believed, through enforcement and promulgation of Rule 18(b), FTD could stop orders from going through AFS for the rebate. This was the first time I remember Rule 18(b) being discussed in this light at an FTD staff meeting. Neither Mr. Maas nor anyone else at the meeting mentioned quality control or consumer protection as reasons for enforcing Rule 18(b).[12]

In December 1981 an FTD test shopper placed an order for an FTD-trademarked arrangement with a branch store of Amlings Flowerland ("Amlings"), one of the nation's "largest retail florists" (Wentland Dep. 472). Amlings sent that order via AFS, but FTD took no immediate disciplinary action (Putro Aff. ¶ 49). Two months later FTD tested Amlings again, and again an FTD-product order was sent via AFS. Amlings' President Paul Wentland ("Wentland") was notified of a scheduled hearing before the FTD membership committee to look into those alleged Rule 18(b) violations, but Wentland did not respond. Amlings was fined $300 (later reduced to $100) (Putro Aff. ¶¶ 50-52). Wentland wrote FTD saying the AFS clearings "shouldn't have happened" and were due to employee error (Putro Aff. Ex. 22).[13] After receiving notice of his penalty, Wentland wrote again in a less conciliatory tone, suggesting FTD had made a number of mistakes at Amlings' expense, for which Amlings could not fine FTD (Putro Aff. Ex. 23).

In May 1982 FTD tested Amlings again, pursuant to a policy of retesting florists under probation. That test found another Rule 18(b) violation (Putro Aff. ¶ 56). Upon receiving notification from FTD, Wentland wrote back he was "appalled at the *harassment*" by FTD, characterizing the test as an "assault." Further, he wrote (Putro Aff. Ex. 27 at 2):

We do not, nor do our attorneys recognize the "presumptions" that are made in FTD's rule 18(b) relating to the question of whether or not FTD "coined" arrangements can ever be sent out via another wire service.

\* \* \* \* \* \*

As florists nationwide have sought to preserve their very existence via the use of the most economical wire service (even after careful consideration of the effect that FTD's large advertising budget has on convincing American consumers to buy more flowers), FTD has sought to retaliate and spend wasted dollars as an excuse for poor management.

Twice in November 1983 FTD member florists notified FTD that Amlings had sent FTD orders to them via AFS. Those complaints were referred to Wentland for a response (Putro Aff. ¶¶ 60–62). Wentland replied Amlings was a member of at least five Clearinghouses and (Putro Aff. Ex. 35):

Amlings is free to use the clearinghouse of its choice. Any attempt by any wire flora, Florafax, etc., in addition to AFS—from diverting to themselves business which results from FTD's creative and promotional efforts, especially when customers ask for FTD by name.

---

**12.** Maas, who joined FTD in 1980 (Maas Aff. ¶ 32), admits he expanded Rule 18(b) enforcement (*id.* ¶ 34):

In late 1981, FTD expanded the use of Sending Test Orders to detect violations of Rule 18(b) and the rules prohibiting curtailment. In my view, it is in FTD's interest to enforce Rule 18(b) more vigorously in order to preserve consumer confidence in FTD and to prevent other wire services—Redbook, Tele-

**13.** In fact Wentland's statement to FTD was a lie. He has admitted the order was intentionally sent via AFS, pursuant to Amlings' established pro-AFS policy (Wentland Dep. 223–24).

organization to enforce exclusive use of their particular clearing facility constitutes a *per se* illegal boycott under Section 1 of the Sherman Act.

At that point FTD sensed Amlings' prior claims of merely erroneous Rule 18(b) violations might have been disingenuous, and it embarked on an extensive test program of all Amlings outlets. Testing continued from December 1983 through February 1985, resulting in several fines, a one-month suspension of 7 of Amlings' 14 stores, and a six-month suspension of 4 stores (Putro Aff. ¶¶ 63–69). During the course of that testing program Wentland's attorneys (who also represent AFS in this action) informed FTD of their view Rule 18(b) "as interpreted and applied" amounted to a per se boycott under Section 1 (Putro Aff. Ex. 38).

AFS did not stand idly by while FTD and Amlings disputed the validity of Rule 18(b). Wentland sent an April 28, 1982 memorandum to his store managers and clerks (Wentland Dep. Ex. 21) (emphasis in original):

> We have just received word from the attorneys of American Floral Services (AFS) that FTD has *no right* to insist that Big Hugs, Ticklers, FTD arrangements from the FTD selection guide, and other FTD arrangements have to be sent FTD. You should send all these arrangements via *AFS* as you were doing before.

Wentland continued to keep Meinders informed of FTD disciplinary activity against Amlings (see Wentland Dep. Exs. 67, 69), and Amlings instituted a policy of attempting to send virtually all its orders through AFS (see Wentland Dep. Exs. 21, 23).

That policy necessarily affected Amlings' Teleflora clearings as well. On December 6, 1982 Resnick had what she described as a "very unpleasant conversation" with Wentland regarding the low level of Amlings' Teleflora clearings. She threatened to terminate Amlings' Teleflora membership unless Amlings started to clear through Teleflora about as many orders as it received via that Clearinghouse.[14]

Resnick conducted further investigations during 1983 and became convinced Amlings not only was failing to keep sending on a parity with receiving but was also violating Obligation 2—necessarily the case in view of Amlings' internal 100%–AFS policy (see Resnick Aff ¶ 16).[15] Teleflora put Amlings on probation as of September 1983.

Amlings responded through its attorneys, stating Teleflora's rules violated Section 1 and threatening suit if Amlings were suspended from Teleflora (Wentland Dep. Ex. 90). Teleflora suspended Amlings in January 1984, and that suspension remains in effect (Resnick Aff. ¶ 17).

Both Resnick and FTD Membership Division Director Donald Putro ("Putro") have sworn their decisions regarding Amlings' discipline were individual and without knowledge of actions planned by the other (Resnick Aff. ¶ 18; Putro Aff. ¶ 64). However, FTD and Teleflora field representatives apparently did have some discussion about Amlings. FTD representative Frank Wren ("Wren") and Teleflora representative Gary Allen ("Allen") were "acquaintances" (Allen Aff. ¶ 5). In November or

---

**14.** In addition to Obligation 2, Teleflora also promulgated Membership Obligation No. 1 ("Obligation 1"), requiring members to support the Teleflora system by sending roughly as many Teleflora-cleared orders as are received (Resnick Supp.Aff. ¶¶ 2–3). AFS (but not FTD) has a similar rule (see Wentland Dep.Ex. 91; Ex. 92, at 5). AFS Mem. 86–87 argues Obligation 1 taken in combination with Obligation 2 serves effectively to double Obligation 2's impact, for Filling Florists would be required to send a Teleflora order for each one received pursuant to Obligation 2. Evidence of such an enforcement approach is scanty (see AFS App. 4 Docs. 23, 25), but even if true that would not

undercut this opinion's analysis of Obligation 2 under a Section 1 rule-of-reason approach. Teleflora's total market power is too small to invalidate Obligation 2 even if its impact were doubled.

**15.** Resnick also determined Amlings was violating Membership Obligation No. 4, which says only Teleflora subscribers could sell Teleflora keepsakes. Apparently not all Amlings shops were Teleflora members, and Amlings sold keepsakes from its non-Teleflora shops as well (Resnick Aff. ¶ 15(b) ).

December 1983 Allen phoned Wren, and in the course of conversation Allen mentioned Teleflora had tested Amlings and was about to take disciplinary action (Wren Aff. ¶ 10; Allen Aff. ¶ 6). Wren may have said FTD had also tested Amlings (Allen Aff. ¶ 6), but he did not care to discuss the matter further (Wren Aff. ¶ 11). Then a few months later Allen told Wren Teleflora had suspended Amlings, and Wren said FTD was still testing (Allen Aff. ¶ 6). Allen asked if FTD were considering disciplinary action, and Wren said he didn't know (Wren Aff. ¶ 12). In neither discussion was Rule 18(b) or Obligation 2 discussed (Allen Aff. ¶ 8; Wren Aff. ¶ 13), and Allen did not report his conversations with Wren to Teleflora's home office (Allen Aff. ¶ 5).[16]

Aside from testing Amlings and other florists for Obligation 2 violations, Resnick sought to make her views on "pirate orders" known to the industry. In January 1983 Herb Mitchell ("Mitchell"), a management consultant employed by AFS (Mitchell Dep. I 5), published an article entitled "Order Control By Wire Service" in his monthly newsletter, *Floriculture Directions* (Resnick Dep. Ex. 6).[17] Mitchell's article argued the Sending Florist "owns" a Customer's order and is legally entitled to send it through whatever Clearinghouse Sending Florist chooses. Mitchell advised florists to post signs and send statements saying (1) the wire service used "makes no difference in the manner in which your order is filled" and (2) unless Customer makes a specific request a Sending Florist will use the Clearinghouse of its choice (*id.*).

Resnick responded by writing Mitchell his legal opinions were "truly erroneous" and his approach was "a disservice to the entire industry" (Resnick Dep. Ex. 7). She disputed Mitchell's statement all wire services were alike and asked him to consider Teleflora's entitlement to clear orders for keepsakes that brought Customers into the shop (*id.*). Finally, she announced she was

sending copies of her letter to Meinders, Maas and FTD President William Raich ("Raich"), urging them to join her "in protesting your article as a grave disservice to the entire floral industry" (*id.*). Resnick received no response from Meinders, Maas or Raich, but Mitchell did reply, also copying Meinders, Maas and Raich (Mitchell Dep. II 128). Mitchell stuck to his guns and also criticized Teleflora for "replacing flower business with gift sales" (Mitchell Dep. Ex. 4). That was the end of the correspondence.

### AFS' Arguments

AFS makes three basic arguments:

1. On their face Rule 18(b) and Obligation 2 are per se illegal boycotts under Section 1.

2. As construed and enforced Rule 18(b) and Obligation 2 are per se illegal boycotts under Section 1.

3. FTD and Teleflora conspired to keep Clearinghouse fees at 6% and to boycott AFS.

This opinion will first discuss the conspiracy theory, which requires the most extensive treatment (though that does not suggest it is any more meritorious—it is not). This Court will then address AFS' other contentions.

### FTD–Teleflora "Conspiracy"

Section 1 provides:

Every contract, combination ... or conspiracy, in restraint of trade or commerce among the several States ... is declared to be illegal....

*United States v. Standard Oil Co.*, 316 F.2d 884, 890 (7th Cir.1963) (citations omitted) fleshes out that concept:

The substantive law of trade conspiracies requires some consciousness of commitment to a common scheme .... Unless the individuals involved understood from something that was said or done that

---

**16.** Wren's affidavit is silent as to whether he reported his conversations with Allen to anyone.

**17.** Though Mitchell is independently responsible for the editorial contents of *Floriculture Di-* *rections,* virtually all its subscribers are AFS members who receive the newsletter as part of their membership (Mitchell Dep. I 16).

they were, in fact, committed to raise prices, there was no violation of the Sherman Act.

True enough, "smoking-gun" evidence of a trade conspiracy may be rare, and no doubt a conspiracy may be proved by circumstantial evidence (*American Tobacco Co. v. United States*, 328 U.S. 781, 809–10, 66 S.Ct. 1125, 1138–39, 90 L.Ed. 1575 (1946)). But circumstantial evidence must still be *evidence*, and AFS' "showing" is simply nonactionable innuendo.

AFS relies, first of all, on the "conscious parallelism" doctrine originating in *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 226–27, 59 S.Ct. 467, 474–75, 83 L.Ed. 610 (1939). There the Court held a conspiracy in restraint of trade could be inferred from an invitation to act in concert followed by parallel behavior consistent with that invitation. But as *Standard Oil*, 316 F.2d at 890, 896 points out, Section 1 was not violated by the parallel behavior itself—rather the parallel behavior following a "solicitation to act in concert" tended to prove the existence of a "commitment to a common scheme." Were it otherwise, anyone who raised prices after hearing a competitor had raised prices would violate Section 1 (*id.* at 896).

■ Thus recent cases (see, e.g., *Quality Auto Body, Inc. v. Allstate Insurance Co.*, 660 F.2d 1195, 1201 (7th Cir.1981), *cert. denied*, 455 U.S. 1020, 102 S.Ct. 1717, 72 L.Ed.2d 138 (1982)) have emphasized that parallel behavior without more (the well-known "plus factor") does not establish a Section 1 conspiracy. Two competitors may adhere to a "common formula" to establish prices, but that may be because each unilaterally finds the formula to be in its best interests. Such a pricing structure may just as likely reflect perfect competition as collusive anticompetitive decisions. Parallel unilaterally self-interested behavior does not violate Section 1 (*id.*). See also *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537, 541, 74 S.Ct. 257, 259–60, 98 L.Ed. 273 (1954) (" 'conscious parallelism' has not yet

read conspiracy out of the Sherman Act entirely").

■ Even if parallel behavior has some probative force in establishing the existence of a conspiracy, it alone cannot carry the day for AFS. *Weit v. Continental Illinois National Bank and Trust Co. of Chicago*, 641 F.2d 457, 462 (7th Cir.1981), *cert. denied*, 455 U.S. 988, 102 S.Ct. 1610, 71 L.Ed.2d 847 (1982) (citations omitted) teaches:

Plaintiffs contend that circumstantial evidence in the record—parallel rates and the opportunity to conspire—are sufficient to meet their burden under Rule 56(e). Clearly, circumstantial evidence can be sufficient to support a finding of a price-fixing conspiracy.... Parallel business behavior or "conscious parallelism" is the type of circumstantial evidence which, absent more direct evidence, will be relied on in inferring unlawful agreement.... However, when defendants come forward with denials sufficient to shift the burden under Rule 56(e), plaintiffs must come forward with some significant probative evidence which suggests that conscious parallelism is the result of an unlawful agreement.... Parallel behavior and the hope that something further can be developed at trial is not sufficient to warrant a trial on the merits.... If plaintiffs are to proceed to trial, they must be able to point to some probative evidence that parallel interest rates resulted from unlawful agreement rather than lawful business reasons.

Any such showing is totally lacking here. AFS points to a number of allegedly probative incidents, but on examination each is illusory.

■ AFS Mem. 106 asserts Resnick's letter to Mitchell, with its copies to Maas and Raich of FTD, was "an invitation to Maas and FTD to 'join' in an industry wide antipirate order campaign." But Resnick's letter was not an invitation to do anything in particular: At most it was by its own terms an invitation to join in "protesting your [Mitchell's] article" (Resnick Dep. Ex. 7, at

2). No plan of action was suggested and no demands were made—contrast the "invitation" in *Interstate Circuit,* 306 U.S. at 216 n. 3, 59 S.Ct. at 469–70 n. 3. And if Resnick—who by this time had discussed the Section 1 question with her counsel, as the letter shows—had any pre-existing conscious commitment to a trade conspiracy, her open copying (not only of Maas and Raich but Meinders as well [18]) was hardly the way to go about concealing that fact. This Court is obliged to draw only *reasonable* inferences in AFS' favor (*Hermes,* 742 F.2d at 353), and AFS cannot get blood from this dwarf turnip.

AFS also charges FTD and Teleflora openly support each other's rules against their own economic interest. That claim is based on several baseless propositions.

*1. Dual Enforcement*

■ FTD Rule 18(c) ("Rule 18(c)") requires an FTD member who also belongs to another Clearinghouse to (Putro Aff. Ex. 14, at 3):

> handle wire orders sent or received through such other wire service or clearing house according to the rules and regulations of such other wire service or clearing house.

In like manner, a January 1982 letter from Resnick to Teleflora members stated (Resnick Dep. Ex. 3, emphasis added):

> We're certain you're aware that Teleflora's exclusive holiday promotions and sales-winning bouquets have helped boost sales for you. However, some florists are wiring orders for specific holiday promotions and special bouquets from the counter selection guide and crediting them to other wire services.

> \*    \*    \*    \*    \*    \*

If you ever receive a wire order that specifies a Teleflora holiday promotion or bouquet from our guide crediting the transaction to another wire service, be sure to alert the sender. Oversights do happen.

> *We feel equally strong that business generated by another wire service should be credited to that wire service. After all, fair is fair for everybody.*

Based on such policy statements, AFS concludes FTD and Teleflora acted to enforce each other's "pirate order rules" contrary to their self-interest, thus tending to prove conspiracy. That is patent nonsense: Those statements are fully consistent with each Clearinghouse's self-interest. Teleflora's appeal for adherence to Obligation 2 really amounts to the statement "fair is fair." It could not compel members to clear orders via its Clearinghouse except by threat of suspension, and after a while such suspensions would be self-defeating. Its only practical real-world means of obtaining effective compliance was to convince florists it "deserved" to clear orders generated by its advertising and promotion. How would that appeal to fairness sound if Teleflora insisted on clearing FTD's trademarked products as well? [19]

FTD's entire appeal through Rule 18(b) was to honest dealing and customer choice. It too could not expect much compliance with its rule if it suggested florists should switch AFS or Teleflora orders to FTD where they had legitimately been sent through those Clearinghouses. So long as alternative Clearinghouses are available to a given florist, threats of fines and suspension could easily be viewed as less effective means of attracting loyalty than an appeal to integrity—an appeal that incidentally im-

---

**18.** Why does Resnick's letter not evidence a conspiracy with *AFS?* Apparently only AFS' consciousness of its own virtue—and of course the fact that such a contention would destroy its argument, though it does not acknowledge that aspect of its motivation—prevents the drawing of that equally implausible inference. As this Court has occasionally remarked in other contexts, AFS' conspiracy notions, based on Resnick's copying to FTD of her letter to Mitchell, are another illustration of all things being yellow to the jaundiced eye.

**19.** FTD was the only other Clearinghouse that chose national advertising and promotion of floral designs and containers as a marketing strategy. But (1) nothing prevented any other Clearinghouse from doing the same and (2) Teleflora's policy was neutrally stated in terms of "business generated by another wire service."

posed no economic burdens, for nothing suggests either FTD or Teleflora in fact disciplined members for violating the other's "pirate order" rule.[20]

In sum, there is no evidence FTD and Teleflora agreed to enforce each other's rules, and there is no evidence either referred to the other's rules for any reason other than its own self-interest. AFS' Mem. 106 assertion that Resnick's letter to Mitchell "expressly informed William Maas of FTD that Teleflora was working in concert with FTD" is simply absurd (see n. 18).

### 2. Sharing of Enforcement Information

■ AFS Mem. 107 points to various documents—again mostly unauthenticated—tending to show some florists reported AFS pirate orders to both FTD and Teleflora. In some other industries (or some other circumstances), that situation might perhaps suggest conspiracy, but here, where florists may and do join any number of Clearinghouses, a great deal of competitive information must inevitably gain general currency. FTD will tell something to Florist A, and Florist A will repeat it to his or her Teleflora representative. Florist B, a member of FTD and Teleflora, will tell both Clearinghouses about pirate orders received via AFS, believing that exchange of information will serve his or her own interests. None of that tends to prove an FTD–Teleflora conspiracy, and AFS' documents show nothing more. See *Monsanto Co. v. Spray-Rite Service Corp.*, 465

U.S. 752, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984) (distributors' complaints to manufacturers about price-cutters are "natural" and "unavoidable"; they "arise in the normal course of business and do not indicate illegal concerted action"). FTD and Teleflora cannot be held to account for what some of their members do.

### 3. Amlings

■ AFS also points to FTD's and Teleflora's allegedly "parallel" disciplinary actions against Amlings, urging a conspiracy may be inferred from evidence of the Wren-Allen conversations in which some competitive information was shared. Once again AFS' position does not survive analysis.

In the first place, the behavior at issue cannot realistically be called "parallel." FTD began its testing in late 1981 and continued testing in response to the evidently hostile message conveyed by Wentland's letters. And FTD still counts Amlings among its members. On the other hand, Teleflora's problems with Amlings date from Resnick's December, 1982 conversation with Wentland (perceived by Resnick, at least, as "very unpleasant" (Wentland Dep. Ex. 88)). They were apparently motivated at least as much by Amlings' violation of Obligation 1—which has no FTD parallel—as by Obligation 2 violations. Teleflora thus terminated Amlings a

---

**20.** AFS points to one of its unauthenticated documents, a June 4, 1982 letter from Resnick to Teleflora member Diane Heigel, commiserating over the number of pirate Teleflora orders sent on Mother's Day. Resnick observed (AFS App. 2 Doc. 50) (emphasis in original):

> I can assure you that FTD has a similar problem and has *threatened* to take very strong action against those shops that are sending pirate orders.

As AFS fails to mention, however, Resnick's letter complains not only about Teleflora orders sent via AFS but also about those sent via FTD. Further, of 133 sending "diversions" detected by *FTD's* testing program since 1981, 31 (or 23%) were to Teleflora (Putro Aff.Ex. 21). If Teleflora and FTD had a stand-off agreement, it was clearly being honored in the breach and not the observance. And of course Resnick's awareness of FTD's threatened disciplinary action was common knowledge in the industry, as any florist who read FTD's membership rules would know. Other documents submitted by AFS as assertedly tending to prove conspiracy—see, e.g., AFS App. 3 Doc. 10, a shop call report filed by an FTD Field Service Representative—simply do not have probative value. At worst they are reports of comments made by *FTD member florists* to their FTD representatives. If those florists were also Teleflora members and made positive comments about Teleflora or negative comments about AFS, such comments are one-way expressions of personal opinion and nothing more. In a world of multiple Clearinghouse memberships florists are going to possess and (at their own pleasure) exchange significant amounts of competitive information. Certainly AFS does not suggest it would be preferable to return to a one-florist-one-Clearinghouse regime.

little more than a year after the Resnick-Wentland conversation, while FTD continues (after more than four years of arm-wrestling) with Amlings among its members.[21]

Aside from that obvious lack of parallelism, the evidence of the Wren-Allen discussions does not support a reasonable inference of "consciousness." Those discussions may fairly be described as chit-chat among industry acquaintances in the field. Both Wren and Allen firmly deny they discussed Rule 18(b), Obligation 2 or any common strategy of enforcement. In the face of that, AFS offers only its fantasy of what might have taken place. From the course of events it is clear each of FTD and Teleflora had embarked on its disciplinary activity well before the Wren-Allen conversations, each for its own reasons. Further, there is no evidence such information as passed between Wren and Allen ever made its way back to those with authority to do something with it.[22]

*4. Resnick-Maas "Agreement"*

■ AFS' most irresponsible claim is of a personal meeting between Resnick and Maas to discuss parallel enforcement of Rule 18(b) and Obligation 2. That claim is based solely on Wentland's Dep. 556–58:

Q. You testified this morning that you had lunch with Mr. Maas in the fall of 1982, is that right?

A. Yes.

Q. And he mentioned that he had just been with Lynda Resnick, is that right?

A. Yes.

Q. Did he tell you where?

A. No.

Q. Did he tell you how long they met?

A. Excuse me, he might have told me where, but I don't recall.

Q. Did he tell you for how long a time they met?

A. No.

Q. Did he tell you the occasion of their meeting, whether it was some particular seminar or where it was?

A. He probably did, but I don't recall.

Q. Did he tell you how long they talked?

A. I don't recall.

Q. You do recall that he said there was discussion about containers, is that right?

A. Yes.

Q. Did he tell you anything else about the conversation with Lynda Resnick other than that there was conversation about containers?

A. He may have, Joel, I don't recall.

\*  \*  \*  \*  \*  \*

Q. Since then, you have assumed that they must also have talked about their membership obligations and rules and so on, is that right?

---

21. Meinders Dep. 179–80 says he infers FTD and Teleflora "got together and suspended one of the largest florists in the country" from the fact that:

> Out of 30,000 florists, it seems a little strange that they would both target the very same shop, and they both would suspend them. That was kind of strange.

But that paints a distorted picture. Each of FTD and Teleflora was entitled to, and did, engage in efforts to enforce its own rule generally, by test purchases and otherwise. And Wentland's own aggressive responses to FTD and Teleflora, coming as they did from one of the nation's largest florist chains (not merely a "shop"), helped to ensure that their enforcement efforts against Amlings would continue. Moreover, Meinders' own premise shows the emphasis on Amlings was not strange at all: Given Amlings' size, any Clearinghouse wishing to

make a point might well focus enforcement on it to do so.

22. Comparison with *Standard Oil,* 316 F.2d at 898–99 is profitable. There a Phillips salesman who had heard Standard was about to raise prices called Standard's office to verify the rumor, and he was told it was true. But the court held that did not show a Phillips-Standard conspiracy (even though Phillips' wholesale jobbers also apparently raised prices) because:

1. Standard did not ask Phillips to take any action.
2. Phillips' salesman had no pricing authority himself, and he did not agree to take any action.
3. Phillips knew of no "plan" to raise prices.
4. Phillips' actions were consistent with its independent self-interest.

All those factors apply to the Wren-Allen conversations here.

A. Since then, I assume that they would have talked about their membership rules.

Q. But you have no basis whatever for that assumption?

A. Up until the initiation of the lawsuit, I would say, yes, I probably assumed that.

Q. But that's not based on any factual information that you have?

A. Not that I can recall at this time.

Earlier Wentland had told Meinders of that conversation with Maas. Meinders Dep. 508–07 says:

A. I recall that he said Maas and Resnick spoke to each other, and I think he might have said, "I imagine they talked about 18(b) and Teleflora's rules."

Q. You think he may have said, "I imagine they talked about 18(b) and Teleflora's rules"?

A. I think that's a true statement, yes, sir.

\* \* \* \* \* \*

Q. Did he tell you that Maas told him that Maas and Resnick had discussed Rule 18(b)?

A. No, he did not, as I said.

Q. And did he tell you that Maas told him that Maas and Resnick had discussed Teleflora's rules?

A. I think the key was always that he imagined. I don't think he ever came out and said that they did. I can't recall—or, I couldn't swear one way or the other.

Neither Maas nor Resnick denies they met—once—in a restaurant parking lot during a florists' convention. Both assert they were "introduced" and quickly separated, and both say there was no discussion of membership rules or enforcement or any business (Resnick Aff. ¶ 10; Maas Aff. ¶ 40).

AFS' attempt to weave a web of conspiracy from Wentland's deposition testimony is truly ludicrous. Wentland's recollection is weak (to say the least), and he is prepared to swear to no more than an "assumption"—"not based on any factual information"—that Rule 18(b) and Obligation 2 were discussed. His "assumption" is not admissible evidence (the standard under Rule 56(e)), and Rule 56 does not call on this Court to draw far-fetched inferences without evidentiary support (*Box v. A & P Tea Co.*, 772 F.2d 1372, 1378 (7th Cir.1985) (affiant's "conjecture" and "speculation" do not suffice to withstand a properly-supported summary judgment motion)).

\* \* \*

In summary, AFS has not met the showing *Weit* demands. There is no probative (or admissible) evidence to support the conspiracy charge. All activities of FTD and Teleflora—even to the limited extent they might arguably be viewed as parallel—were fully consistent with individual self-interest. Independent action—even if it might be shown to harm competition—does not violate Section 1 (*Quality Auto Body*, 660 F.2d at 1201).[23] Thus AFS' Count III

---

**23.** AFS argues it is impermissible to "compartmentalize" the evidence in a Section 1 case, citing *Continental Oil Co. v. Union Carbide Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962):

> In cases such as this, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and thus wiping the slate clean after scrutiny of each. "... [T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole. *United States v. Patten*, 226 U.S. 525, 533 ...; and in a case like the one before us, the duty of the jury was to look at the whole picture

and not merely at the individual figures in it." *American Tobacco Co. v. United States*, 147 F.2d 93, 106 (C.A. 6th Cir.1944).

But it requires no sophistication in mathematical theory to recognize that zero plus zero plus zero still equals zero. This Court's analysis of AFS' proffered evidence of conspiracy has not "wiped the slate clean" after considering each incident. If no incident has probative value, all incidents taken together have no probative value. Further, *Continental Oil's* admonition does not suggest—as AFS Mem. 99–100 appears to assert—this Court must give weight to a party's submissions in contravention of Rule 56(e)'s requirement that parties must "set forth such facts as would be admissible in evidence."

cannot survive the FTD and Teleflora summary judgment motions.[24]

### Rule 18(b) and Obligation 2

With the asserted existence of joint action between FTD and Teleflora ruled out, this opinion turns to AFS' claim that Rule 18(b) and Obligation 2, as individually promulgated and enforced, constitute "boycotts" under Section 1. On that score the litigants' positions mirror the time-honored pattern in antitrust cases:

1. AFS labels the "boycotts" "horizontal" and says they are per se illegal.

2. Each of FTD and Teleflora says its rule is "vertical" and must be analyzed under the rule of reason.

Before that dispute is addressed, one preliminary matter deserves attention. FTD says Rule 18(b) is really no restraint at all, for on its face it would allow a florist to use AFS (or any other Clearinghouse) 100% of the time, so long as Customers expressly approve. AFS counters in several ways:

1. Sending Florists assertedly find it burdensome to explain the existence of Clearinghouse options to Customers (Meinders Dep. 680–81), especially because floral sales staff may not be adequately trained to give the explanation (*id.* at 684).

2. In any case Sending Florist "owns" the order and has the right to send it as he or she sees fit (*id.*). Customers' only concern is the recipient's satisfaction with the order as delivered (*id.* at 689).

3. FTD's Customer-choice rule is a "sham," because it is actually enforced by FTD to require FTD clearing of FTD-trademarked products and generic items misleadingly claimed by FTD as its own (see Schlesier Aff.).

This Court need not decide whether to accept any of those claims as valid (each reflects at least some shakiness).[25] It will

24. It should be added there is no evidence at all as to price fixing. AFS apparently theorizes FTD and Teleflora wanted to drive AFS out of business in order to maintain a 6% Clearinghouse fee without "rebates." But there is no evidence of specific discussions or agreements about the 6% fee itself. FTD raised its rate from 5% to 6% in April 1980 because of its unfavorable debt/equity ratio (Maas Aff. ¶ 43). In June 1980 Teleflora followed the rate upward (Resnick Aff. ¶ 21). AFS Mem. 9 n. 3 asserts FTD had advance warning of Teleflora's rate hike—but even were that so it would be irrelevant, for FTD had already raised its rate. More significantly, if Teleflora (after watching the effect of FTD's increase in rate on Teleflora's own business) believed 6% was what the market would bear, its own increase might be considered parallel behavior—but it is insufficient to bar summary judgment absent "some probative evidence that parallel ... rates resulted from unlawful agreement rather than lawful business reasons" (*Weit*, 641 F.2d at 462). In any event, AFS' rate is also 6%, and its self-characterization as a "discount" Clearinghouse is not wholly accurate (as explained earlier in the text, the "rebate" is not a discount from the 6% fee paid by Filling Florists, but rather a sort of sales commission paid to Sending Florists for steering the transactions AFS' way).

25. For example, it is scarcely credible that a salesperson capable of handling a long-distance order to begin with could not give a brief explanation of Clearinghouse options. Indeed, that is what AFS' consultant Mitchell advised in his

*Floriculture Directions* article (Resnick Dep.Ex. 6). Second, Meinders' concept of order "ownership," coupled with his broad assumption Customers do not care how the order is sent, is questionable factually and legally. AFS' own survey shows (Meinders Dep.Ex. 42, at 3):

1. 17% of Customers "often" request a wire service by name.
2. 33% did so "once in a while."
3. 33% "seldom" did so.
4. 16% "never" did so.

Third, the affidavit of Schlesier, an Arkansas florist, is really the only solid evidence AFS has produced (despite its exhaustive discovery) suggesting "sham" enforcement. And that affidavit offers less than meets the eye. Schlesier says she was told by her FTD representative that FTD "required me to clear all orders for FTD containers through the FTD clearinghouse," but she was not told FTD rules would allow her to clear orders through another wire service with Customer permission. Of course her representative was not her only source of information about FTD's rules: Presumably she had a copy of the membership guide with the rules in it. More importantly, Schlesier's later (Dec. 9, 1985) Aff. ¶ 3 says at the time the FTD representative called on her she knew Rule 18(b) allowed her to suggest alternative Clearinghouses to her Customers. Thus Schlesier's first affidavit cannot readily be parsed as AFS would like. In any event, there is no evidence here FTD actually disciplined her for failing to send FTD-container orders via FTD. Schlesier also says the representative made her "sign a document indicating

be remembered the current version of the interpretation of Rule 18(b), which specifically articulates Selling Florist's right to inform Customers of their ability to designate a Clearinghouse other than FTD, is a 1982 modification. To treat with AFS' claim for damages based on past conduct, this Court must deal with the earlier interpretation of the Rule as well. And on that earlier version, it might arguably be a question of fact whether a Customer's right to designate a Clearinghouse—absent the Customer's having been advised of that right—was illusory. Accordingly, to avoid having to parse the different versions, this Court will make an arguendo assumption most favorable to AFS (though not called for by the Rule's language): that Rule 18(b) would instead require all orders for FTD-source-identified products to be cleared through FTD.[26]

For current purposes, therefore, it will be unnecessary to indulge any separate analysis of Rule 18(b) and Obligation 2 (termed collectively, then, the "Pirate Order Rules"). Instead the pro-AFS assumption will be made that each Pirate Order Rule is intended to protect the business generated by the Clearinghouse promulgating the Rule. If Obligation 2 is legal on its face, plainly that is so a fortiori as to Rule 18(b).

*1. Horizontal Boycott?*

 In standard antitrust parlance, a "horizontal" restriction is one between competing sellers, while a "vertical" restriction is one between firms in different stages of the chain of distribution (*Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 678 F.2d 742, 744 (7th Cir.1982)). Boycotts are "concerted refusal[s] to deal" (*Quality Auto Body*, 660 F.2d at 1206). AFS claims the Pirate Order Rules are used to enforce a horizontal boycott of AFS' Clearing-

house. But AFS' explanation of the asserted horizontal nature of the restraint is sketchy at best.

*National Collegiate Athletic Association ["NCAA"] v. Board of Regents of the University of Oklahoma*, 468 U.S. 85, 104 S.Ct. 2948, 2959, 82 L.Ed.2d 70 (1984) defined a horizontal restraint as:

> an agreement among competitors on the way in which they will compete with one another.

If all florists agreed to sell a dozen roses for $25, that would be a classical horizontal restraint to prevent price competition. If all florists agreed to sell a maximum of a dozen roses per week, that would be a horizontal limit on output, which would tend to raise the price of roses. Horizontal restrictions are almost always considered per se illegal under Section 1 because there is a very high probability they are anticompetitive (*NCAA*, 104 S.Ct. at 2960). Thus AFS would like to shoehorn the Pirate Order Rules into the horizontal model if at all possible.

AFS relies on a trio of cases: *Associated Press ["AP"] v. United States*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); *Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); and *United States v. General Motors Corp. ["GM"]*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). But a brief review of those cases demonstrates that though their facts are superficially relevant here, each really involves a different economic phenomenon from that presented by this case.

In *AP* an association of newspapers had established by-laws prohibiting distribution of AP news to non-member newspapers and allowing a competing newspaper a virtual veto right over admission of new mem-

---

that I would comply with this request"—not indicating what that "request" was. If that was a request to send orders via FTD, apparently such a practice is common in the industry. Meinders Dep. 424–25 admitted it is AFS policy to get signed commitments from florists stating they will increase AFS sending.

**26.** In that respect, FTD must recognize that consumer welfare was admittedly not the whole of its motivation when it stepped up Rule 18(b) enforcement in late 1981: Maas specifically admitted (Aff. ¶ 34) he believed FTD should step up Rule 18(b) enforcement to prevent other wire services from getting business generated by FTD's "creative and promotional efforts."

bers (326 U.S. at 10–11, 65 S.Ct. at 1419–420). Those by-laws, which allowed competing newspapers to starve out non-members from news essential to be competitive (thus restricting the output of news), were held to violate Section 1 because they permitted competitors to cut down their own competition—a horizontal restriction (*id.* at 15, 65 S.Ct. at 1422).

*Silver* struck down a rule of the New York Stock Exchange ("NYSE"), an association of brokers, that prohibited direct telephone connections with non-member brokers. As in *AP*, the information furnished on NYSE wires was held an essential part of the brokerage business—without it, a broker could not effectively compete with other brokers (373 U.S. at 348, 83 S.Ct. at 1252). And also as in *AP*, the effect of the NYSE rule was to give some brokers a leg up on competing brokers at the same level of operations—a classic horizontal boycott (*id.*).

In *GM* an association of Chevrolet dealers enlisted GM's support to impose economic sanctions on Chevrolet dealers who sold cars to discount brokers. Once again the object of the restriction (imposed by GM at the behest of the full-price dealers, 384 U.S. at 133, 86 S.Ct. at 1324) was to disadvantage some dealers to the benefit of their competitors. Though in *GM* the actual restriction came from the manufacturer and was not an association by-law, the effect was not to advantage GM over *its* competitors but to help some Chevrolet dealers in their competitive campaign against other Chevrolet dealers, with the purpose of eliminating discounting competitors.

Each of FTD and Teleflora has done something quite different. Their respective Pirate Order Rules control the business relationships between florist and Clearinghouse. There is no association of "ins" whose rules deny critical products to their "out" competitors. Thus the Pirate Order Rules do not function like the by-laws in *AP* and *Silver,* nor were they enacted by FTD or Teleflora in furtherance of their members' schemes to restrict competition among florists, as in *GM.* To the contrary, what evidence there is suggests most members would—like Amlings—prefer not to have the Pirate Order Rules. What a member Sending Florist would no doubt prefer is to have access both to (1) the product lines developed by FTD and Teleflora (thus being able to deliver a wider range of attractive choices to Customers) and (2) whatever consumer identification the FTD and Teleflora trademark and servicemark advertising may have created, while at the same time basing the Sending Florist's Clearinghouse choice on price considerations alone (thus taking advantage of the AFS "rebate").[27]

Clearly the Pirate Order Rules are restrictions placed by FTD and Teleflora on the activity of their member florists. Such restrictions between one level of an industry and another are "vertical" (*Valley Liquors,* 678 F.2d at 744). FTD and Teleflora distribute products (containers, keepsakes and trademarked or otherwise source-identified flower arrangements) and services (communications facilities, Clearinghouse functions and promotion) to florists, and in classic vertical fashion they have placed certain restrictions on those florists if they are to continue to deal.

That is not to say application of the "vertical" label means there can be no anticompetitive effect. Vertical agreements are still agreements, and if they restrain trade within the meaning of Section 1 they are illegal. But AFS cannot resort to the quick kill of per se condemnation here.

---

**27.** Again no high level of economic analysis is needed to see that a Clearinghouse whose budget includes large advertising commitments and large amounts for product development will find it more difficult to compete in terms of sheer price with a Clearinghouse whose sole or principal emphasis is on price, to the exclusion of such added services to its members. In any event, AFS is wrong in giving the impression there is no price competition among Clearinghouses. FTD's monthly dues are less than half AFS' (Meinders Dep.Ex. 18, at 29, 31). Further, FTD does offer a true rebate to its members in the form of "patronage refunds." Total refunds in fiscal 1984 were close to $3 million (Maas Aff. ¶ 29).

Vertical agreements are typically subject to rule-of-reason analysis.

### 2. Rule of Reason

■ Per se condemnation of restraints under Section 1 applies when there is a "likelihood of predominantly anticompetitive consequences" (*Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, —— U.S. ——, 105 S.Ct. 2613, 2620, 86 L.Ed.2d 202 (1985)). But as *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 54, 97 S.Ct. 2549, 2559, 53 L.Ed.2d 568 (1977) put the standard:

> Vertical restrictions promote interbrand competition by allowing the manufacturer to achieve certain efficiencies in the distribution of his products. These "redeeming virtues" are implicit in every decision sustaining vertical restrictions under the rule of reason.

Thus (*id.* at 59, 97 S.Ct. at 2562) per se condemnation is inappropriate to vertical-restriction cases, and a rule-of-reason inquiry must be employed.

Under rule-of-reason analysis the essential question is (*National Society of Professional Engineers v. United States*, 435 U.S. 679, 691, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978)):

> whether the challenged agreement is one that promotes competition or one that suppresses competition.

FTD and Teleflora argue the Pirate Order Rules promote competition by eliminating AFS as a "free rider" on their promotions and advertising efforts. That argument, thus put, may be crude but (with refinements) has compelling force.

Production of goods or services usually requires the investment of capital. Entrepreneurs invest capital with the expectation they will reap a benefit from that investment. If an entrepreneur invests capital and a competitor reaps the benefit, there will be little incentive to invest more capital, and there will be less production. In brief, that is the "'free rider' effect" (*Continental T.V.*, 433 U.S. at 55, 97 S.Ct. at 2560). Section 1 does not require competitors to share the rewards of "entrepreneurial risk-taking" (*Phil Tolkan Datsun, Inc.*

*v. Greater Milwaukee Datsun Dealers' Advertising Association, Inc.*, 672 F.2d 1280, 1288 (7th Cir.1982)).

To a certain degree free riding is attendant to most advertising investments, at least where the advertising is designed as much to get consumers interested in the product or service itself as in the advertiser's own brand. That is especially true where the product is novel, obscure or poorly understood. For example, many banks advertise the virtues of IRA accounts each year at tax time, and those advertisements may well prompt customers to open such accounts at non-advertising banks where they already have an established relationship.

But that does not mean the advertising banks have a right to interfere with the business of the non-advertising banks to claim deposits "rightfully theirs." And by the same token, FTD and Teleflora have no right to prevent such purely collateral benefits of their advertising from rubbing off on AFS, their competitor. To that extent AFS is correct in arguing prevention of the free-rider effect will not support a restriction on *interbrand* competition under the rule of reason.

What the parties gloss over, though, is that *AFS* is not the "free rider" in this case in the usual sense. Instead, *Sending Florists* who steer clearings away from FTD and Teleflora so they may receive the rebate are the ones who benefit from FTD and Teleflora advertising most directly (see n. 27). To the extent advertising and product promotion educate consumers about floral sending and create a general demand for floral Clearinghouse services, that indirect benefit may legitimately be reaped by the florists who sell those products and services. Sending Florists "free ride" (and AFS then benefits from their free riding) only if the Sending Florists decide to double dip by using the FTD or Teleflora floral designs or containers while at the same time collecting the AFS rebate.

Viewed properly from that perspective, the Pirate Order Rules are not impermissi-

ble restrictions on interbrand free riding. Instead they are legitimate agreements ancillary to the cooperative agreements between florists and FTD or Teleflora. *Polk Bros, Inc. v. Forest City Enterprises, Inc.,* 776 F.2d 185, 188–89 (7th Cir.1985) teaches:

Cooperation is the basis of productivity. It is necessary for people to cooperate in some respects before they may compete in others, and cooperation facilitates efficient production. See [*Monsanto,* 104 S.Ct. at 1470]. Joint ventures, mergers, systems of distribution—all these and more require extensive cooperation, and all are assessed under a Rule of Reason that focuses on market power and the ability of the cooperators to raise price by restricting output.

\* \* \* \* \* \*

A court must distinguish between "naked" restraints, those in which the restriction on competition is unaccompanied by new production or products, and "ancillary" restraints, those that are a part of a larger endeavor whose success they promote. See *NCAA, supra.* If two people meet one day and decide not to compete, the restraint is "naked"; it does nothing but suppress competition. If A hires B as a salesman and passes customer lists to B, then B's reciprocal covenant not to compete with A is "ancillary." At the time A and B strike their bargain, the enterprise (viewed as a whole) expands output and competition by putting B to work. The covenant not to compete means that A may trust B with broader responsibilities, the better to compete against third parties. Covenants of this type are evaluated under the Rule of Reason as ancillary restraints, and unless they bring a large market share under a single firm's control they are lawful. See *United States v. Addyston Pipe & Steel Co.,* 85 F. 271, 280–83 (6th Cir.1898) (Taft, J.), *aff'd,* 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899).

In *Polk Bros.* two retailers agreed to build a store in which they would share space. For the most part their product lines were complementary, and the new store would be a boon to local consumers (776 F.2d at 189–90). But the agreement to cooperate could not go forward unless Polk Bros. got assurances the other store would not compete with it in certain key product lines. Otherwise it would not have been worthwhile for Polk Bros. to cooperate (*id.* at 190):

It is easy to see why. Polk spent substantial sums in advertising to attract customers to its stores, where it displayed and demonstrated the appliances. It might be tempting for another retailer to take a free ride on these efforts. Once Polk had persuaded a customer to purchase a color TV, its next door neighbor might try to lure the customer away by quoting a lower price. It could afford to do this if, for example, it simply kept the TV sets in boxes and let Polk bear the costs of sales personnel and demonstrations. Polk would not continue doing the work while its neighbor took the sales. It would do less demonstrating and promotion, to the detriment of consumers who valued the information. The Supreme Court has recognized that the control of free riding is a legitimate objective of a system of distribution. See *Monsanto, supra,* 104 S.Ct. at 1469–70; *Continental TV., supra,* 433 U.S. at 55–57 [97 S.Ct. at 2560–561]. . . .

Similar analysis applies to the agreements between florists and FTD or Teleflora. Cooperation between florists and Clearinghouses is beneficial to the consumer: It enables florists to offer products and services consumers desire. Advertising and product development partly serve to increase consumer awareness of floral sending and of the fact choices are indeed available. That promotes interbrand competition to offer better services and more attractive products. But each of FTD (on the pro-AFS assumption already explained) and Teleflora obviously is not prepared to enter into such cooperative agreements with florists, as to the FTD and Teleflora source-identified components of those Clearinghouses' business, if the florists do not also agree to patronize the producing

Clearinghouse so the latter can derive the economic benefit of that business.[28]

Now that the appropriate mode of analysis has been established, the next step in the rule-of-reason approach is to assess market power. *Polk Bros,* 776 F.2d at 189 tells us an ancillary restraint is lawful unless it brings a "large market share under a single firm's control."

"Market power" is usually a very difficult concept to define, and it is especially so in this case. Obviously such power has something to do with market share, and recent cases (see, e.g., *Will v. Comprehensive Accounting Corp.,* 776 F.2d 665, 672 (7th Cir.1985)) have treated firms with less than 30% market share as presumptively lacking market power. That would give Teleflora a clean bill of health, because its total share of the Clearinghouse market is far below that even by AFS' unofficial estimate (AFS App. 8B Ex. 1).

As for FTD, AFS has done no more than allege its share of the total clearings market is between 60 and 70% (Mitchell Dep. I 53; AFS App. 8B Ex. 1).[29] And Rule 18(b) does not apply to FTD's whole market

share: At most, only clearings of FTD-identified arrangements and containers are affected.[30] On that score, AFS' expert Mitchell estimated (Dep.Ex. 3, at 2) the whole "holiday specials" market (where "both FTD and Teleflora are concentrating their efforts") at "less than 20% of the wire service business." Clearly FTD's ability to dominate the industry through market share is far weaker than would be implied by the 60–70% figure AFS offers.

FTD does not seriously dispute its total market share is "in the 60-percent range" (FTD Stmt. Material Facts Not in Dispute ¶ 19). But except for AFS' claim that its own rather spectacular growth rate (from a 3.82% market share in 1980 to 10.71% in 1984, AFS App. 8B Ex. 1) has slowed in the last year or so (AFS Stmt. of Genuine Issues of Dispute ¶¶ 58–60), AFS has not met its burden of showing any *evidence* of FTD's market power.

After all, market share is at best a proxy for market power, and a rough one at that.[31] What really counts is the ability of a producer to control output and obtain "supracompetitive prices" (*NCAA,* 104

---

**28.** It bears repeating, *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (emphasis in original):

> The antitrust laws, however, were enacted for "the protection of *competition,* not *competitors.*" *Brown Shoe Co. v. United States,* 370 U.S. [294], at 320 [82 S.Ct. 1502, at 1521, 8 L.Ed.2d 510].

Although AFS portrays itself as a "discount" Clearinghouse, it is difficult to see how the *consumer* benefits when a florist uses AFS. There is nothing in the record to indicate Customers get a discount when AFS is used—indeed, that would be unlikely because the cost of clearing is borne by the Filling Florist, who pays the same 6% whether AFS, FTD or Teleflora is used. No doubt the consistent use of AFS will make an individual florist's operation more profitable (assuming no loss of business, a result that might occur if FTD or Teleflora cut the florist off), but AFS does not argue it is either common or possible for a Customer to benefit from use of AFS over FTD or Teleflora in any given case. See *Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 1559–60, 80 L.Ed.2d 2 (1984) (Sherman Act was "especially intended to serve" the interests of the consumer).

**29.** AFS' table of market share data (Ap. 8B Ex. 1) shows FTD's market share steadily declined from 74.02% in 1980 to 68.49% in 1984. But those figures are obviously incomplete. Meinders himself estimated annual Clearinghouse business at $750 million (Dep. 73), with "quite a bit" of direct billing between florists in addition (*id.*). AFS' table is somehow based on a total "market" of $669,985,547: Obviously, that does not include the whole market. Nor does the table offer any explanation of its sources.

**30.** It bears repeating that this entire discussion is premised on a worst-case (and likely unrealistic and unfair) reading of Rule 18(b). At least in its current form, the Rule need affect no clearings at all, for on its face it permits florists to use another Clearinghouse for all orders—and to tell Customers about their right of designation, in order to accomplish that result.

**31.** See, e.g., Judge Learned Hand's famous *ipse dixit* about market shares and monopoly power in *United States v. Aluminum Co. of America,* 148 F.2d 416, 424 (2d Cir.1945):

> [Ninety percent] is enough to constitute a monopoly; it is doubtful whether sixty or sixty-four percent would be enough; and certainly thirty-three percent is not.

S.Ct. at 2966). In those terms the ready availability of substitutes in the market undercuts market power (*id.* at 2967). If a seller offers "a unique product that competitors are not able to offer," it can have market power (*Jefferson Parish,* 104 S.Ct. at 1560–61). But AFS urges that Clearinghouse services (viewed narrowly, in AFS' view, as "banking" services) are freely fungible, and the record clearly shows competitors are able to get into the business on a very small outlay: Meinders' own initial investment in AFS was only $500 (Meinders Dep. 942). Carik, a Clearinghouse started by a former AFS executive in 1983, already had over $6 million in clearings in 1984 (AFS App. 8B Ex. 1). Six Clearinghouses began business in the past five years (Maas Dep. Ex. 3, at 2).

That torpedoes any notion FTD has the kind of market power capable of condemning the otherwise reasonable Rule 18(b) under the rule-of-reason analysis. AFS has shown no "barrier to entry that prevents competition" (*Will,* 776 F.2d at 672). Without such a barrier, there is no market power (*id.*). Without market power, the rule-of-reason analysis establishes vertical restraints are valid as a matter of law (*id.* at 671). AFS has produced nothing more than ominous rumblings to contradict the obvious demonstration from the record that barriers to entry in the floral Clearinghouse market do not exist. Thus Rule 18(b), like Obligation 2, must pass a rule-of-reason analysis.

There is an alternative legal characterization of Rule 18(b)—likely a more accurate one on the assumption (the best possible one for AFS) that Rule 18(b) is the practical equivalent of Obligation 2. Teleflora's restriction is esentially a tie-in, conditioning the sale of a Teleflora-source-indicated item upon the use of Teleflora's Clearinghouse. Any Sending Florist who wants to sell a Teleflora keepsake must tie that sale to the purchase of Teleflora's Clearinghouse services. If FTD's Rule 18(b), despite its stated freedom of choice based on Customer's informed direction to Sending Florist, were viewed as equally restrictive to Obligation 2, the approach of the tying cases would thus come into play.

*Will* was in fact a tying case, and the analysis of market power undertaken by our Court of Appeals there was identical to its *Polk Bros.* analysis and is generally applicable to all vertical-restraint cases. Such an analysis would also turn on the existence of market power in the tying commodity (FTD-source-designated products), and the result here would be the same. See *Jefferson Parish,* 104 S.Ct. at 1566. From any perspective, then, Rule 18(b) is unexceptionable in antitrust rule-of-reason terms, and AFS must fail.

### Conclusion

There are no genuine issues of material fact, and each of FTD (as to Counts I and III) and Teleflora (as to Counts II and III) is entitled to a judgment as a matter of law. This action is dismissed with prejudice.[32]

### Appendix 1

Current Text and Accompanying Interpretation of FTD Rule 18(b)

(b) Florists' Transworld Delivery Association orders received from another Member shall be filled only in accordance with the rules and regulations of FTD. A Member who takes an order from a customer shall follow the instructions of the customer.

(i) A Member taking an order who is instructed by the customer to send the order as an FTD order shall send the order only to an FTD Member and

---

32. This opinion has perforce dealt with the record in its entirety, necessarily ignoring the parties' disputes over "sensitive" and "supersensitive" discovery materials. Under the circumstances, no effort has been made to decide which of those claims has real force and which really masks a desire to blunt disclosure during the discovery process. Accordingly this opinion will be maintained under seal until the parties have had an opportunity to suggest any proposed redactions appropriate for the version that will be published and open to public inspection in this District Court's files. Failing any submissions along those lines on or before February 21, 1986, this opinion will be made publicly available and published in this form.

shall process the order through the Clearing House of FTD.

(ii) A customer who orders from a Member an arrangement or other floral item by reference to a trademark used by FTD, or by reference to an arrangement or other floral item pictured in the Selection Guide or other consumer guide published by FTD, is presumed to have instructed the Member to send the order as an FTD order and the order shall be sent to an FTD Member and processed through the Clearing House of FTD unless the customer expressly instructs otherwise. Any Member of the Association who refuses to accept an FTD order and send the order to an FTD Member for processing through the FTD Clearing House after being instructed by a customer to send the order as an FTD order shall be suspended from membership or otherwise disciplined.

*Interpretation:* This rule reaffirms the duty of a Member to maintain honesty in business dealings in all transactions, and will subject a Member to discipline if he or she fails to do so. FTD has at times received complaints from consumers who believe that they have not been treated fairly. Questions are sometimes raised as to whether the consumer has received full value for local orders, for FTD orders or for orders placed by FTD Members through other wire services or clearing houses. In cases where a Member who is also a member, subscriber or user of another wire service or clearing house engages in curtailment, customers have directed criticism at FTD and FTD Members because the florist on whom they relied was a Member of FTD. Customers who expect to receive FTD's high quality of service have also complained about the quality of service provided to them when they thought they were dealing with FTD, only to find that their orders had been diverted to another wire service or clearing house.

Customers have a right to receive FTD service when they ask for it by name or by reference to FTD trademarks, the FTD Selection Guide, and other consumer guides published by FTD. The palming off of orders intended for the FTD Clearing House to other wire services or clearing houses cannot be tolerated.

The essence of Membership Rule 18(b) directs FTD Members to honor customers' requests that orders be sent via FTD. It does not prevent FTD Members from dealing with other wire services or clearing houses, and indeed does not restrict a Member from using a different clearing house in transmitting an FTD arrangement which the customer has ordered by reference to a trademark used by FTD, if the customer approves. In particular, a sales person can, consistent with Membership Rule 18(b), suggest the use of another wire service or clearing house so long as he or she clearly informs the customer—who has, after all, ordered the FTD advertised and/or trademarked arrangement—that the order will not be handled by FTD. If the customer approves, the order may be sent through another wire service or clearing house. Of course, the FTD Member should understand that the FTD Guarantee and services will not apply to that order.

The foundation of public confidence in the flowers-by-wire idea is the integrity of the sending and the filling florist. Through the years, the overwhelming number of FTD Members have evidenced this integrity by maintaining honesty in all business dealings. On occasion, however, a Member of FTD may violate this principle. When this happens, all other Members of FTD are damaged by the resulting public disaffection and distrust. In order to enforce this principle of honesty in business dealings, FTD has enacted stringent rules against specific practices that violate the principle, and will

take disciplinary steps when necessary to prohibit practices such as curtailment (i.e., a violation of Rules 8(a), 8(b) and 9). In appropriate cases, these can result in termination of membership in FTD.

## ON MOTION TO VACATE

This Court's February 13, 1986 memorandum opinion and order (the "Opinion")[1] granted the motions for summary judgment filed by each of FTD and Teleflora, thus dismissing in their entirety the antitrust claims brought by AFS.[2] AFS had made three such claims:

1. FTD's Membership Rule 18(b) ("Rule 18(b)") amounted to a horizontal boycott of AFS and enabled FTD to fix the price of floral clearinghouse services.

2. Teleflora's Membership Obligation 2 had the same purpose and effect.

3. FTD and Teleflora conspired to boycott AFS and fix floral clearinghouse prices.

In granting both defendants' summary judgment motions, this Court necessarily found there was no genuine issue of material (that is, outcome-determinative) fact as to any of those claims. That included a determination AFS had failed to raise a genuine fact issue as to whether or not FTD or Teleflora possessed market power (see Opinion at 221–22).

Now AFS has moved under Fed.R.Civ.P. ("Rule"[3]) 59 to vacate the Opinion[4] and under Rules 56(e)–(f) to supplement the record with two newly-offered affidavits:

1. one by AFS Chairman Herman Meinders ("Meinders"), concerning the capital investment required to establish AFS; and

2. the other by MIT economist Jerry Hausman ("Hausman"), reviewing the Opinion and disagreeing with its economic analysis.

AFS Mem. 11 says those documents show the existence of a genuine and material fact issue as to FTD's market power (without in any way reflecting on the Opinion's conclusions as to Teleflora individually or as to the FTD–Teleflora conspiracy claim). AFS also asks—at this late date, after some two years of extensive discovery, nearly a year after the close-of-discovery date set by this Court, and of course *after* the case has already been decided on the record made by the parties—that FTD and Teleflora be compelled to respond to new AFS requests to admit or to submit to new depositions by AFS. For the reasons stated in this memorandum opinion and order, AFS' motion is denied in all respects.

### New Evidence

As this Court has consistently held (see, e.g., *Keene Corp. v. International Fidelity Insurance Co.,* 561 F.Supp. 656, 665–66 (N.D.Ill.1982) (footnote omitted), *aff'd and adopted,* 736 F.2d 388, 393 (7th Cir.1984) ):

Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence. *See Evans, Inc. v. Tiffany & Co.,* 416 F.Supp. 224, 244 (N.D.Ill. 1976). Such motions cannot in any case be employed as a vehicle to introduce

---

1. This opinion will assume familiarity with the Opinion and its terminology. It will not repeat either the Opinion's factual statement (including most of its defined terms) or its substantive analysis, except to the extent required for current discussion.

2. As this opinion later reflects, that dismissal did not terminate the entire action, because Teleflora had filed a counterclaim against AFS.

3. As the only relevant Rules are 56 and 59, no confusion should be engendered by pressing the word "Rule" into double service, applying it to FTD's Membership Rule 18(b) as well.

4. Because the opinion was not a final order (see n. 2) and there was thus no judgment entered in the case, Rule 59 does not of course apply. This seems to be a simple mistake, rather than another example of the general disinclination of AFS' counsel to play by the Rules (a predilection that shows up in far more serious instances, discussed later in this opinion). Moreover, the motion's mislabeling does no harm. Accordingly this opinion will address the merits of the motion to vacate rather than its incorrect label.

new evidence that could have been adduced during pendency of the summary judgment motion. *See Walker v. Hoffman,* 583 F.2d 1073, 1075 (9th Cir.1978), quoting *Donnelly v. Guion,* 467 F.2d 290, 293 (2d Cir.1972):

> The non-movant has an affirmative duty to come forward to meet a properly supported motion for summary judgment:

> A party opposing a motion for summary judgment simply cannot make a secret of his evidence until the trial, for in doing so he risks the possibility that there will be no trial. A summary judgment motion is intended to "smoke out" the facts so that the judge can decide if anything remains to be tried.

Our Court of Appeals too has confirmed and reconfirmed that principle, not only by its adoption of this Court's *Keene* statement but more recently in *Publishers Resource, Inc. v. Walker-Davis Publications, Inc.,* 762 F.2d 557, 561 (7th Cir.1985) (quoting much of the same *Keene* language with approval).

That concept is a necessary corollary of the very nature of summary judgment as the equivalent of a trial—or more precisely, as the determination that no trial is needed because there are no material factual disputes to be resolved by the factfinder (whether court or jury). See *Factofrance Heller v. I.P.M. Precision Machinery Co.,* 627 F.Supp. 1412, 1416 (N.D.Ill.1986). No more justification exists for the party on the losing end of a summary judgment motion thereafter to advance new matters—matters that could have been asserted during the Rule 56 process—than for the loser in a trial thereafter to come forward with evidence that could and should have been put before the trier of fact in the first instance.

AFS cannot quarrel with those fundamentals. Instead it tries to skip over the obstacle course they present by arguing its affidavits contain no new evidence or legal theories but merely point up the Opinion's "manifest errors of law and fact."

■ It does AFS too much credit to label that mere sophistry (a term that would connote some superficial plausibility for AFS' false argument). Meinders Aff. ¶¶ 3–5 contain hitherto unrevealed assertions as to AFS' investments and capital expenditures, while the Hausman affidavit contains all sorts of economic doctrine AFS failed to present earlier. And there is (understandably) not the slightest suggestion that information was not readily available to AFS when it filed its lengthy memorandum and voluminous materials in opposition to the summary judgment motions. Having then argued FTD's market power followed ineluctably from its approximately 60% market share—and having seen that argument rejected by the Opinion—AFS now simply presents (1) alternative evidence of market power in the form of the allegedly high cost of market entry and (2) Hausman's "appellate review" of the Opinion based on economic formulas this Court was never asked to consider or evaluate. That is precisely the sort of abuse *Keene, Publishers Resource* and *Factofrance Heller* identified, and it cannot be allowed here.

But there is more. Authoritative post-Opinion case-law developments show AFS' motion would necessarily fail on the merits even if the new affidavits had been tendered in compliance with, rather than in defiance of, Rule 56 principles. This opinion will deal in brief compass with the applicability of those recent cases to the Opinion and AFS' belated contentions.

### Market Power Standard

■ FTD's share of the clearings market is high—over 60%.[5] But Opinion at

---

5. AFS R.Mem. 3 suggests FTD's market share is really 70%. That scarcely qualifies as grounds for reconsideration. Opinion at 221 & n. 29 discussed AFS' claims in that respect (showing a decline in FTD's asserted position from 74% in 1980 to 68½% in 1984). Thus any current claim of a 70% figure would represent a minor and immaterial differential, but even that is not the critical issue. As this opinion's later discussion shows, that new figure—even if accepted as true—does not alter the Opinion's result.

221–22 took that figure only as an analytical starting point (footnote omitted):

> After all, market share is at best a proxy for market power, and a rough one at that. What really counts is the ability of a producer to control output and obtain "supracompetitive prices" (*NCAA* [*v. Board of Regents of the University of Oklahoma*, 468 U.S. 85], 104 S.Ct. [2948,] 2966 [82 L.Ed.2d 70 (1984)]). In those terms the ready availability of substitutes in the market undercuts market power (*id.* [104 S.Ct.] at 2967. If a seller offers "a unique product that competitors are not able to offer," it can have market power (*Jefferson Parish [Hospital District No. 2 v. Hyde*, 466 U.S. 2], 104 S.Ct. [1551,] 1560–61 [80 L.Ed.2d 2 (1984)].

*Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance, Inc.*, 784 F.2d 1325, 1334–36 (7th Cir.1986) now confirms that conclusion in detail. It is unnecessary to repeat at length *Ball Memorial*'s analysis (much of which could have been written for this case; see, e.g., the language quoted in this opinion's n. 7). Suffice it to say *Ball Memorial* establishes the following propositions:

6. One of AFS' claims (echoed by Hausman Aff. ¶ 32) is that FTD's not-for-profit status gives it a tax advantage over AFS (and Teleflora too, of course).

7. It is not clear just how large the Blues' market share was. Though more than 80% of some Indiana hospitals' patients were covered by the Blues, and throughout that state some 50% of all hospitals' revenues came through the Blues, the Blues argued they insured only about 27% of Indiana patients. But as *Ball Memorial* goes on to say (784 F.2d at 1330–31):

> Just how "large" the Blues are turns out not to matter, so we do not pursue the question.

And that statement clearly refers to *Ball Memorial*'s later analysis (*id.* at 1336):

> Still, the Hospitals say the conclusion [that there are no entry barriers] is legally irrelevant. Ease of entry and the absence of barriers do not matter if the defendant has a large market share. The Hospitals are wrong. Market share is just a way of estimating market power, which is the ultimate consideration. When there are better ways to estimate market power, the court should use them.

1. Firms without market power "bear no burden of justification" under the rule of reason (784 F.2d at 1334–35).

2. Market power is the "ability to cut back the market's total output and so raise price" (*id.*). If some firms cannot prevent other firms from entering the cut-back market (because, for example, they control the necessary raw materials or productive assets), they lack market power in the sense relevant to antitrust law (*id.*).

3. Firms that benefit from special tax advantages may have a leg up on their competitors,[6] but the policy supporting tax benefits to not-for-profit associations is "no concern of antitrust law" (*id.* at 1335).

4. In the absence of entry barriers, even a very large market share does not indicate market power (*id.* at 1336).

*Ball Memorial* found Blue Cross/Blue Shield of Indiana, which had a commanding share of their relevant market (*id.* at 1330–31),[7] lacked market power because they controlled no assets or facilities necessary to prevent entry of competitors into the market should they cut back production and raise prices. That supports the Opinion's analysis a fortiori. In particular,

\* \* \* \* \* \*

> The inquiry in each case is the ability to control output and prices, an ability that depends largely on the ability of other firms to increase their own output in response to a contracting by the defendants. Indeed it is usually best to derive market share *from* ability to exclude other sources of supply.... If the definition of the market builds in a conclusion that there are no significant additional sources of supply and no substitutes from the consumer's perspective, then market share indicates power over price.

Here AFS has tendered not a shred of evidence even hinting it (or Teleflora or Carik or Redbook or any and all other clearinghouses, either singly or in the aggregate) could not readily step in to fill any gap left by a constriction in FTD's output or that FTD has any means of preventing them from doing so. Indeed all the evidence before this Court on the Rule 56 motions pointed in exactly the opposite direction: AFS was both anxious and able to do just that.

Meinders' list of the investments he was required to make (over an indefinite period of time and not at the start—he began with $500 and is now the second or third largest clearinghouse in the country) includes nothing over which FTD has any control. FTD cannot increase the cost of AFS' real estate, telecommunications system, computer and data processing or personnel. It costs money to get into virtually any business. AFS has not even begun to show either (1) it pays more for its component inputs than FTD does or (2) FTD in any way dictates the price of those inputs. Nor is there any hint the free-market costs of entry are somehow prohibitive in a way that implicates the antitrust laws.

Further Hausman Aff. ¶¶ 9–11—discussing the Lerner Index and FTD's expenditures on "product differentiation"—rest on the assumption (urged by AFS but rejected by the Opinion) that FTD's "product" is clearinghouse services alone. FTD actually offers an integrated package of (1) goods (containers, flower arrangements, catalogues) and (2) services (clearinghouse, quality guaranties, national advertising). That entire package—which AFS does not (and cannot) deny generates consumer interest and confidence in floral sending—is funded by FTD's receipts.

AFS does not offer a similar package. Instead it offers "rebates"—also funded by clearinghouse receipts. But whether the return to the florist is in the form of rebates or FTD's package, the economic effect is the same. What Opinion at 218 said (quoted out of context by AFS R.

Mem. 5) was essentially that florists would probably prefer to "double dip" by paying one clearinghouse fee and collecting two benefits funded by such fees: FTD's package and AFS' rebate. And what Opinion at 218 n. 27 went on to say was AFS' model of pure price competition based on rebates was therefore flawed. Hausman's conclusions, thus derived from faulty premises, are equally flawed.[8]

*Ball Memorial* wipes out the substance of AFS' market-power argument.[9] There is no "manifest legal error" on that score.

*Summary Judgment Standard*

▪ AFS' memorandum in opposition to the FTD and Teleflora summary judgment motions began with the obligatory citation to *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), advising "sparing[ ]" use of summary judgment in antitrust cases. But that advice simply reflects the usual factual complexity of antitrust cases, a situation always calling for caution in summary judgment analysis.

Now *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, — U.S. —, 106 S.Ct. 1348, 89 L.Ed.2d 538 (U.S.1986), makes plain the *Poller* caveat is only that and not an inexorable mandate. In upholding summary judgment for defendants in a complicated factual setting of antitrust claims, *Matsushita* said (106 S.Ct. at 1356–57):

> Respondents correctly note that "[o]n summary judgment the inferences to be drawn from the underlying facts ...

---

**8.** Hausman Aff. ¶ 14 correctly observes the Opinion "displays some hesitation in accepting the rebate as a 'discount.'" Certainly the rebate is not a direct discount to customers unless passed along to them when AFS is used instead of FTD—and it is not. Opinion at 221 n. 28 did recognize the possible long-term benefit to a florist whose total operation is made more profitable by collecting AFS rebates. But aside from the question whether that benefit is readily translatable into a *consumer* benefit (the only kind relevant for antitrust analysis), that sort of benefit is no different from the long-term benefit florists derive from national advertising and product development, which also may make a florist more profitable. AFS' rebate is entitled

to no special antitrust deference. To repeat: Rebates and FTD's product/service package are economically fungible.

**9.** It must also be remembered the Opinion's market-power analysis was explicitly premised on a "worst-case" analysis of Rule 18(b) (see Opinion at 221 n. 30). Because Rule 18(b) provides Sending Florists may use other clearinghouses if they obtain the Customer's express permission, florists are free to make extensive use of AFS. FTD's market share is thus even more tenuously related to any power it assertedly has over the clearings market than would be required to fail the *Ball Memorial* test.

must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 [82 S.Ct. 993, 994, 8 L.Ed.2d 176] (1962). But antitrust law limits the range of permissible inferences from ambiguous evidence in a [Sherman Act] § 1 case.

\* \* \* \* \* \*

To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently. [*Monsanto Co. v. Spray-Rite Service Corp.*, ] 465 U.S., at 764 [104 S.Ct., at 1471]. Respondents in this case, in other words, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed respondents.

That logic has particular application to AFS' urging this Court to consider the numerous unauthenticated documents submitted with its memorandum in opposition to summary judgment.[10] Those documents were offered primarily to show instances of alleged conspiratorial behavior between FTD and Teleflora. In fact Opinion at 213 n. 20 discussed the weakness of any argument based on those documents (even when assumed arguendo to be admissible). But in any event the strong inference of advantageous independent motivation requires a far more powerful showing than those documents could make at best.

*Matsushita* is also relevant to AFS' market-power argument. Hausman Aff. ¶ 6 says the Opinion had an insufficient data base on which to determine the market-power question. That of course is really AFS' fault, not FTD's or this Court's. If AFS had such information, *Keene, Publishers Resource* and *Factofrance Heller* teach the evidence had to be presented for consideration. That is the unambiguous thrust of the final two sentences of Rule 56(e). It is not the *court's* obligation to guess at what a litigant should have caused the record to contain.

Nor does Rule 56 require courts to ignore conclusions based upon the parties' actual submissions, on some hypothesis that the nonmovant's case might have been stronger had other unidentified evidence been offered instead. In *Matsushita* terms, that means this Court is not bound to ignore the obvious and reasonable inferences supported by the record as submitted, in favor of hypothetical other evidence that *might* exist to create a material issue of fact.

### Teleflora's Counterclaim

Because of the parties' intense focus on the summary judgment motions attacking AFS' claims, the litigants did not address the existence of Teleflora's counterclaim until the Opinion had issued. At that point the presence of the counterclaim made it necessary to consider the possibility of a Rule 54(b) determination to confer finality on the dismissal of AFS' action.

Now Teleflora has acted to obviate that consideration. It moves for dismissal of its counterclaim, and AFS has not opposed that motion. It is of course granted.

### Conclusion

AFS' motion to vacate the Opinion and to supplement the record is denied.[11]  This

---

10. Again reflecting a total disregard for the time-and-place aspects of the litigative process, AFS seeks to invoke discovery measures (requests to admit or depositions) *now* to cure its own lack-of-authentication problems. But FTD and Teleflora raised those flaws during the Rule 56 process. AFS had the opportunity to do something about the matter then. It didn't. Once more the analogy to pre-trial (permissible) and post-trial (impermissible) establishment of a proper trial record compels rejection of AFS' current efforts.

11. Tenacious to the death (or in this instance even post-mortem), counsel for AFS have just asked leave to file an unbidden reply memorandum on their current motion, (1) purporting to explain how *Ball Memorial* should be read and (2) offering still another set of documents. Counsel's efforts induce a sense of deja vu. They are the same law firm that represented

Court reaffirms the Opinion without reservation. Finally, Teleflora's motion to dismiss its counterclaim is granted. This action is dismissed in its entirety.

---

another litigant—Car Carriers, Inc.—before this Court in a case in which they likewise presented a wrongheaded view of the antitrust laws and tried unsuccessfully to cure the fatal flaws in their position by belated attempts to beef up the record. See *Car Carriers, Inc. v. Ford Motor Co.,* 561 F.Supp. 885 (N.D.Ill.1983), *aff'd,* 745 F.2d 1101 (7th Cir.1984), *cert. denied,* —— U.S. ——,

105 S.Ct. 1758, 84 L.Ed.2d 821 (1985). Counsel were unsuccessful in *Car Carriers,* and they deserve no better fate here. Leave to file the memorandum is granted (simply because this Court has read it), but leave to file the new evidence is denied for the reasons previously stated.